Statement Number 8, Convention Number 8, Sierra Club Petitioners, Environment, Education, and Health. Ms. Powell, the Petitioner, Ms. Catherine, the Respondent, and the Rebuttal Committee. Good morning. Good morning. May it please the Court, my name is Carrie Powell, and I represent the Petitioner, Sierra Club.  Under the Clean Air Act, a source that is subject to major new source review must install state-of-the-art air pollution controls. A source that is classified as minor may not have to install any controls at all. Under the challenge action, EPA declares that it and states may ignore unambiguous evidence that a source is subject to major new source review and allow the facility to operate without complying, releasing uncontrolled air pollution that is known to cause death. Today I'd like to address three issues. First, why venue is appropriate in this Court. Second, why EPA's action violated the Clean Air Act. And third, why EPA violated the Administrative Procedure Act by promulgating a legislative rule without providing for public notice and comment. Title V of the Clean Air Act requires that each major source of air pollution obtain an operating permit that assures its compliance with all applicable requirements under the Act. The Act specifically includes as applicable requirements the requirements of a state implementation plan, and the Act specifies that a plan must include major new source review requirements. Thus, Congress plainly intended for a Title V permit to assure the facility's compliance with major new source review if it applies. In violation of the plain language of the Clean Air Act and EPA's Title V regulations, EPA now declares that if a source has been issued a minor source permit, EPA and states may ignore evidence that the source is subject to major new source review and issue the Title V permit without addressing major new source review requirements. Your position would be that any time the agency is adjudicating an issue regarding an individual source, it necessarily belongs to be litigated in this Court? No. This order is fundamentally different from any Title V order that EPA has issued throughout the history of the program. EPA's response to that is, well, it had to explain why it was concluding as it did, and that did take a few pages, 20 I think. And therefore, since it hadn't explained it before, the fact that this one is a little longer than the type of order you normally see really shouldn't make any substantive difference in terms of deciding where jurisdiction lies in terms of venue. Your Honor, two issues in your question that come up. The first is venue and the second is the Administrative Procedure Act. I'll start with the venue issue. So for venue, the Cleaner Act in Section 307 establishes that nationally significant EPA final actions are to be reviewed in the D.C. Circuit. There are two paths for obtaining D.C. Circuit review for nationally applicable actions. The first is if the action is nationally applicable, and the Court has held that nationally applicable is to be determined on the face of the order. What sets this order apart from any other Title V order is that it expressly applies a new rule to all permitting actions, all permitting authorities nationwide, and all EPA staff. Could you just tell us which part of the language in the statute you're now focusing on? Are you looking at nationally applicable regulation or final action taken? Is that what you're looking at? We contend that... Tell us specifically which part of the statute you're relying on. So in Section 307B, there are two paths forward. Right. And we believe that either path could apply here. Well, how can the second one... How can the nationwide scope or effect apply since there's been no... The administrator has not found or published that such action is based on such a determination. There's no such publication here. Your Honor, the EPA did publish the order. Of course it published the order, but it didn't in it... It didn't find that such action is based on such a determination. Your Honor, we contend that this order is unambiguous, that EPA announced that its new interpretation that it set forth in this order applies across the board to permitting authorities and EPA staff and all permit proceedings nationwide, not just in responding to petition orders like this one, but in the overall administration of the Title V program by permitting authorities and by EPA. This is very different than what an order would normally do in an adjudication because it goes so far beyond the case-specific facts that would be at issue in this order. And we contend that the language is so clear that this determination has nationwide scope and effect and that EPA relied on this determination in acting on the Hunter petition that this amounts to a finding and publication that the order is based on its determination of nationwide scope or effect. But also, Your Honor, we contend that this is an unusual case in which what EPA has done is actually nationally applicable on its face. The plain language declares how EPA expects for the program to be implemented going forward. And this declaration already is having effects. It's already in effect nationwide and having legal consequences. But it will only have an effect in another adjudication, correct? No, Your Honor. It's not like a regulation that applies across the board to regulated parties. This would only... Am I wrong about that? This is a precedent that would apply in future adjudications, correct? Your Honor, just as EPA's federal Title V rules are designed to govern implementation of the Title V program, there is no difference between what those rules do and what EPA is attempting to do here. It's not just guiding how EPA is to respond to Title V petitions going forward. The vast majority of Title V permitting actions across the country receive no public input. But that doesn't mean that it's not providing a public benefit. The public is relying on the state and EPA to administer the Title V program in a way that assures compliance with applicable requirements under the Act. And so under the express language of this order, it's not just saying that in the future EPA will respond to Title V petitions this way. It says, across the nation, permitting authorities and EPA staff, when they are confronted with a situation where a source has previously been issued a minor source permit, they are not to consider evidence that major new source review actually applies. And so that is why this is different, this is nationally applicable, and it's actually a legislative rule that EPA is attempting to push into an adjudication and thereby avoid both public notice and comment and D.C. Circuit review. Ms. Powell, I may have missed it, but are you saying that not only does this have an effect on whether businesses can proceed at the Title V stage, but that it also casts a shadow on what EPA thinks its responsibilities are in terms of assessing or reassessing the pre-construction permit compliance with the SIP and or with the Act? Yes, Your Honor. Let me just follow up because I want to hear your response to this. EPA can itself challenge or bring an enforcement action if it thinks that the approval or pre-construction permit doesn't comply with the Act or with the SIP. It's not cut off by a five-year statute of limitations, is it? Well, so just to be clear here, you're talking about citizen suits, which is part of the enforcement function, but here we're talking about the role of Title V permitting. Right. And what I'm asking is, I thought you said that if there were no citizen suits, that that would change what EPA thought its responsibilities were in the Title V process. And I was trying to understand the logic of why you would say that, because it seems to me whichever way we or the Tenth Circuit rule in this case, EPA still has ongoing responsibilities to assure that a permit was properly issued, and it can come back later and say it wasn't. Is that what it would have been able to do prior? Let me clarify. So the reason that Title V is different from anything that existed prior to 1990 under the Clean Air Act is EPA has direct authority to review state Title V proposed permits and to object to a permit that does not assure compliance with Clean Air Act requirements. And it's not just discretionary. They have to object if they determine that it doesn't comply. So the vast majority of permit actions work like this. The state puts it out for public comment. There usually isn't any public comment. They propose it to EPA. EPA has 45 days to review the permit. If they conclude that it is deficient, they have to object. If they don't object and there has been public comment, the public has an opportunity to petition EPA, and if they demonstrate that the permit is deficient, then, again, EPA has to object. That's a very powerful oversight mechanism that EPA's order has now changed. But does EPA review and find the defect? They can't. Why not? Because EPA has now said that it interprets the act to mean that applicable requirements are defined by the issuance of a minor source permit. If the state has issued a minor source permit, regardless of whether it can be easily demonstrated that that state's initial issuance of that determination was an error and that major new source review applies, EPA has said that under the law of Title V, that that does not matter for Title V. Well, in your brief, you point out a tension. I thought you put a lot of emphasis on the tension between the agency saying applicable requirements means what you just said for purposes of whether citizens can be brought under in a Title V renewal proceeding, but not for purposes of the EPA. And it says in the order under review that the incorporation of the terms and conditions of pre-construction permits into the Title V operating permit does not indicate that EPA agrees the state reached a proper decision and it could disagree. So I took that to mean that EPA itself does not think that it's off limits for it to do that further review. So, and this is a very important point. This order and what EPA is arguing is about what Title V requires and what EPA and states have to do under Title V. And so EPA's order and EPA's position in its brief very clearly sets out that EPA no longer will have the ability to object to a Title V permit based upon the omission of major new source review requirements if there is a minor source review permit in place. This is important because EPA is not saying that enforcement is entirely different. But enforcement authorities were here before Title V. Title V is layered on top of all of this. It provides an easy administrative way to clean house and make sure that sources are complying with the act. So EPA doesn't care. I would characterize this as an administrative review under the Title V or within the Title V context. Whether EPA may still look at the content of the permit and say actually this was wrong even though it's saying that citizens may not push EPA to do that. They under this order and under the legal interpretation that they have announced is now the law of the land. EPA cannot object to a Title V permit and use that Title V authority created in 1990. If the source has a minor source permit, EPA's interpretation is that the question is answered. The door is closed. Now you referred to tension that we had in our brief. And this is real tension that fundamentally makes EPA's action not only unlawful but also arbitrary. Because EPA is saying, well, never mind about that whole Title V program that Congress enacted in 1990 to actually address all this widespread noncompliance. We still have our enforcement authorities. And we can assure compliance by bringing enforcement. And so the tension that we're saying is that what EPA has said is that for Title V purposes, a requirement that can be enforced against the source in court is nonetheless not an applicable requirement for Title V. And that interpretation not only contravenes the plain meaning of applicable requirement, but it also runs unambiguous intent for Title V to simplify enforcement and to promote compliance without even the need for litigation by identifying up front through the Title V permit proceeding what the obligations are on the source. You know, you've made a very good case here. But what I'm struggling with is I don't see how, maybe you can explain to me how this order is different from many other orders that have general precedential effect and even affect the way the agency enforces the law. We have held again and again that orders like that aren't rulemaking just because they affect the way the agency functions and or they have future effect. How do we distinguish this case from all of those? The most straightforward way that you distinguish this case is that what an agency cannot do, according to Supreme Court case law, is what the agency cannot do is promulgate a rule and especially a, they take an action in that adjudication that contravenes and effectively revises an existing legislative rule. And the legislative rule here is 40 CFR Part 70 and 70.2, which defines applicable requirement. This order and this new nationally applicable rule that EPA has established contravenes the plain language of that rule. The Supreme Court has held that, let's assume you're right about that. The court has held that, I think the court has held that an informal, a guidance can't revise a published notice of comment regulation. And so that's the merit. You can argue that in the Fifth Circuit. Why does that affect the Danube case? In other words, aren't you turning the merits of the case into the Danube issue? Do you see my point? Maybe I didn't make it very clear. If the, just because the, under our precedent, this circuit's precedent, just because the order affects the way the agency functions and has clear precedential effect in future cases, we don't, this circuit precedent says that's not an order. That's not a rule. That's not something that has to go through notice of comment rulemaking. Your answer is, well, look, this violates a regulation. Well, why isn't that the merits? Excuse me? Because it effectively revises the regulation. This is not just an order where it happens to be. But it can't. A guidance can't revise a regulation. But this goes well beyond guidance. There's not going to be. An order can't revise a regulation. This is not a situation where nothing's going to happen to anyone in the future until there's another adjudication and another chance to challenge it. That's not what's going on here. What EPA has done is explicitly establish a new rule that is in conflict and effectively revises the Title V rule that governs how it's implemented. The regulation says applicable requirements. Why isn't it fair to characterize the EPA as having sort of shifted one way and then shifted back on how it reads applicable requirements? So it had, you know, guidance in the, whatever it was, in the 90s and until now saying that one could look at the substance of a permit based in part on the had to be in compliance both with the implementing plan and Title I permit. And now the agency is saying, oh, but the Title I permit is the case-specific application of the implementation plan. And, therefore, we only have to ensure that the pre-construction permit is, that it's complying with that applicable requirement. I'm sorry. I'm being very wordy. But why does it matter whether they've changed a regulation or just changed a policy? Because we're talking here about whether it's nationally applicable for venue purposes, whether it's nationally applicable. And if you can't show that they've changed a regulation, is that- No. This is nationally applicable. I mean, it could be an order that's nationally applicable. And I guess then the question is, I mean, it's a strange statute, the venue provision. It seems to be saying where you do a bunch of things that one might characterize as regulations, the venue is in D.C., where it says a bunch of other things where one might characterize as source-specific orders, venue is in the regional circuit. But it doesn't say venue over regulations, D.C., venue over orders out in the field. So my question is, if it doesn't say that, how do we tell which orders are to be reviewed here? If we rule for you, how do we distinguish the rest of the cases that really do feel like they belong in the regional circuit? So if you look at all the cases, this is highly unusual. And in all the situations where you have a case where it was held that actually this isn't nationally applicable or the other way around, that it is nationally applicable, you didn't have a situation where in what is purportedly a source-specific action, the agency goes out there and makes no bones about it. They announce that this is the way that the program is implemented, not just through source-specific adjudication, but all aspects of administration of this program going forward. And that's explicitly the words that they use there for permitting authorities, not just Utah and, you know, not anything specific to the Hunter plant, but permitting authorities and EPA staff across the country are to be following this new rule. And this is truly a – it does – everything about this order is different. There's no other Title V order that EPA has been able to point to where EPA has announced that they are fundamentally changing the way that the program is administered, departing from the interpretation that they have applied throughout the history of the program. Ever since they first responded to a Title V petition and applied the regulations and the statute, they have held that, of course, the issuance of a minor source permit does not determine whether major new source review applies. And they still know that, but that's not what it did. They declared at the beginning of the program that they did deal with the way they're doing it now, and you're saying, no, they never did. There is no basis for that. They are now declaring that somehow, without ever mentioning explicitly minor source permitting, that they're – instead of, you know, looking at the plain language of the actual regulation that they promulgated, which says that an applicable requirement includes the requirements of an implementation plan, including major new source review requirements since they have to be in the plan, instead of following that, which is unambiguous, they have now come up with this revised history that says, oh, well, in the preamble we have some language that suggests that we always meant for that to be the case. That language, it doesn't even mention minor source permits. In the plain language, but the statute, the regulation requires the other outcome, and that's what EPA has done throughout the history of the program. Well, if we were to rule for you on venue, and if we were to agree that EPA had to look at the merits of your Title V requirements, what is it that the Hunter plant is failing to do to be in compliance with major source requirements? And Pacific Corps says, we're emitting less than we were back when this permit was issued. So what they have failed to do is go through the major new source review permitting process. That is an extensive and all-encompassing process. They have to determine the best available control technology for each significant emissions unit. I thought they said they're using that. No. They have never gone through new source review for these. They said they're using best available. That sources all the time can say that they're using best available control technology. Sometimes they say that nothing is best available control technology because it's just too expensive. You don't really know that until you go through the process. We contend that they need to be doing more, and typically best available control technology reduces pollution by 90 to 95 percent. So that's excellent if their emissions have been going down over time. One would hope for that. However, installing the additional controls that you would have to do through BASC virtually always brings about significant emission reduction. Do you want to save some time for rebuttal? Yes, I would. I see that my time is up. We'll give you some time. Excuse me? We will give you some time. Thank you. I appreciate that. Thank you. May I please report? My name is David Kaplan, Attorney with the Department of Justice, representing EPA. My counsel is John Coleman with EPA, and also Blaine Lawson with Pacific Corp. Your Honor, this case belongs only in the Tenth Circuit because, again, you rest in that court alone. On the question of national applicability, it's clear that this is an adjudication. It's an adjudication that applies to one plant and one plant alone. What about the first 20 pages? Your Honor, there are five claims, five claims, separate claims, distinct claims that are addressed in the order. I'm talking about the first 20 pages. And their EPA wanted to take the time to explain up front, up front what it was doing. And it was important, Your Honor, because... EPA says, in the future, if a state has issued a minor court permit, EPA will never review the adequacy of that permit at or during the Title V proceeding. Period. In this case, we agree with the plant five objections. In that hypothetical, does your argument stand up? Your Honor, the agency here applied an interpretation to a particular scenario, and I disagree with the characterization. Yeah, in my hypothetical. I have to answer that. My hypothetical is EPA is talking to the first 20 pages about how it interprets the Act specifically, this applicable requirement. Yes, it interprets the Act in this context, and this is why it did that. The agency's initial interpretation in 1992 in the preamble did talk about how the agency would not reconsider and reevaluate the substantive outcome of pre-construction permit determinations. Yes. It was then in SHINTEC, an adjudication applied to a particular plant, the agency first enunciated its different view, that it might go back and look back to evaluate in certain circumstances. So, the agency here did a very good job of explaining why in the factual situation here, and only in this scenario, would it be appropriate to go back or to not go back and revisit the substance of this case. I'm not sure I saw it. It's scenario specific. Has there been any Title V permitting since this one where they have looked under the hood at the Title I pre-construction permit? No. Your Honor, you don't have to even look outside the administrative record to answer your question, because in this case, there were multiple claims. Claim C, for example, was an allegation that there were certain modifications that the Hunter plant undertook that were never permitted by the state, and EPA did not apply its interpretation that applied to Claim A. It didn't apply to Claim C. Now, that's not highlighted in this case, because they elected not to challenge that. But the point is, this is a particular scenario where the state on Claim A did not reevaluate, and so EPA was confronted with the question of, well, did the state have to reevaluate the substance of its prior Title I permit 20 years earlier? Did the state have to? And EPA had to answer that question. It had to interpret. And it did so in this context, though it did not have to. But in any case in which there was a pre-construction permit, has the agency looked at whether that permit meets applicable requirements of the relevant implementation plan? And I take it that the answer to that is no. Well, I think the way your question… I'm just trying to understand your claim that there's some case specificity about this announcement of an interpretation. Let me answer first your question, because the agency does look in all subsequent adjudications, are applicable requirements included? But the agency believes that what it's supposed to do is look to see if the outcome of the pre-construction permit program, which is a permit applied to the circumstance, has been included. Now, there have been subsequent adjudications. If there's no permit, as you say for Claim C, there's a, well, there's no permit, so that hasn't been included, so there's a concern. But that's different from the situation here where there is a permit. And I'm just, I'm literally just trying to understand what you're saying about whether this is kind of a context specific or whether it's a general approach. And you may still prevail on venue if it's a general approach, but I'm just trying to understand what you're saying about that. It's happened, the agency's interpretation here has happened to the circumstance. Now, in other adjudications, the agency may have, and in fact has, looked to the Hunter order, and not as a binding precedent. It can't be binding precedent. It's not binding, right. Of course not, it's not. And just a non-binding explanation of the agency's interpretation in that case, and applied it as a belief fit in the other circumstance, in those other circumstances. And it believes it fits everyone the same way it fits here. I don't know that that's the case, Shona. There are differences. And the differences that come up can involve, is there changed information that's being presented to the agency from what was available when the pre-construction permit was issued? Has the state itself voluntarily reconsidered? These are all different types of case specific scenarios that have to be adjudicated case by case. My question about this very peculiar venue language. I have the same question for you that I have for Ms. Powell, which is, I mean, one way when you read this language is to think, oh, if it's a regulation, then it's nationally applicable. And if it's an adjudication, almost by definition, it's regional. It's not nationally applicable. But it strikes me that Congress didn't say that. And so I'm trying to understand why they went to all the trouble to have this serpentine provision if they didn't think that maybe some adjudications might be nationally. I would look at it the other way around. The other way, not every regulation necessarily is nationally applicable. And so, yes, adjudications are almost always going to be case specific. Almost? What's the hint? Because I can't – I would say always. But, Your Honor, I can't imagine all the different scenarios in which adjudications take place. Could there be a nationwide adjudication? I don't trust my imagination to exhaust the possibilities. So that's the hedge. But I think Terri will say that adjudications are always regional. Maybe a nationwide permit. I don't want to prejudge a circumstance I can't imagine. But here, the case law in this court is clear. Nationally applicable is supposed to look at the face of the action. But that's where it comes from. That's right. And in your brief, you point up to page 20, but it doesn't say what you say page 20 says. And that's why I gave you my hypothetical. And you won't answer it. And I understand why you won't answer it. But the reason I pose this is to try to understand what your position is. If EPA had said what you're saying, presumably that would be somewhere in this document. Now, obviously it mentions the facility and the context. But it goes beyond that. That's what we're focusing on. It's beyond that. It's not that you, let me be clear about this, it's not that you may not prevail. But it's just what has this particular order accomplished? And how does that fit in with this venue statute? I think that your question is critical. But I don't think that this is a circumstance where the agency went beyond anything more than what it had to address to resolve the fact that this is before it. If you look at the 20 pages. I could give you that. Right. All right. But that doesn't necessarily mean you prevail on the venue point. Well, Your Honor, if this court were to rule that an interpretation the agency gives of its reg. And keep in mind, this is not an amendment of the legislative rule. This is an amendment of a prior interpretation enunciated in adjudication. But you agree, 70.2. I agree that that's a legislative rule. That's right. So if you're interpreting a phrase in that rule. Yes. You don't think that's an amendment? No. Whenever an agency, I mean, Perez, the Supreme Court said when a court interprets a reg, I mean a statute, that doesn't mean that we amended the statute. I totally agree. But that's the agency saying how we interpret a statutory phrase. Surely it's telling us what its interpretation is. And it's changed. Yes, you acknowledge that there's ambiguity and you have changed it. That's right. The agency's initial interpretation of 70.2 was that we don't go back and reconsider the merits of these pre-construction permit decisions. And it's broad language and it's not limited just to where there is a major permit. It's broad language. Despite what the opposing counsel said. Now, when you have, when the agency in 1997, it had the SHMTEC order. That was an adjudication that said, well, we might go back and interpreted its regs differently. It didn't modify those regs. It interpreted them differently. And now the agency is interpreting them again. And it is going back to its prior, original interpretation. And none of that modifies the regulation. So, Mr. Kaplan, are you making, I mean, there is a formal argument available to you. But I didn't take you to be making it. Which is, you look not at what the order says. You look not on an honest base about reorienting the agency's policy as a whole. You just look at its actual footprint. And that order is an order about the Hunter plant. Period. 10th Circuit. That is. That's not really what I take your argument to be. No, I haven't gotten out all my points. And when it comes to national applicability, the case law is very clear. Well, it's not really down in these weeds. It's direct legal effects. No, there are cases like this. It's the direct legal effects. It's the applicable scope of the order, of the order alone. And there is no denying that the applicable scope of the order applies to this and this plant alone. I think we all understand that adjudications and interpretations of adjudications can have some non-binding administrative precedent for the public, for agencies. It's not binding. But this court has never held that that. I don't understand why you say this order says that this is the agency's approach going forward. Right. How can you say it's not binding in the future? It's not binding because it wasn't, it's not established as a rule. But you can't, the agency can't amend a regulation in an order. It can't be that that's the rule. Is your point that the only adjudicative order that could be heard here as opposed to the regional circuit is one that amends a regulation? Is that your point? No, no. Because you kept saying in response to Judge Rogers, you said three times, this does not amend the regulation. Why is that the point? Well, that's important because if we have a nationwide regulation that is a legislative rule and the agency amends the legislative rule, then presumably that would be nationally applicable too. But you can't, an agency can't amend a legislative rule through an adjudication. What do you mean yes? I agree with your point. But the words approach going forward in that order, which everybody is focusing on, that comes up in the context of the agency doing, I think, a pretty good job. I thought your argument was a lot easier than you're making it. I thought your point was, yes, this is an adjudication that has precedential effect. It says, this is what we're doing going forward. We have changed our interpretation of the law. I thought your point was, yes, that's what happened, but that doesn't convert it into a rule. It's just an adjudicative order with precedential effect, period, 10th Circuit. Isn't that your argument? If I haven't made that clear, shame on me. Okay. Because that is what we intend to do. I thought your case was getting a lot harder. No, no, that is our argument, Your Honor. What difference does it make that it didn't amend a legislative rule? Pardon me? What difference does it make that the order didn't amend the regulation? I think that gets into the procedural arguments, Your Honor, and the merits arguments. But when it comes to the venue, you're correct. It's not applicably, nationally applicable. And what about Ms. Powell's argument that, yeah, sure, this one is different because this order is not only the rule going forward, but it's actually affecting the operations of the EPA now. This is what agency employees are now implementing this new interpretation. Well, Your Honor, if she's saying that this may have some precedential effect in the future, that's non-binding, then that's true. Why do you keep saying non-binding? Because it's an adjudicative order. Right, so it is non-binding. I guess the question then is, I don't know, I don't mean to interrupt my colleague. Go ahead. Could the agency tomorrow issue an order that ignores this? In an adjudication, could it, without acknowledging this decision, go back to its previous rule? Yes, Your Honor. It could in a subsequent adjudication, but the burden is on the agency. Without acknowledging this one? Well, no. Of course it could. Of course. It's non-binding until the agency changes it. It's binding to this plan, the administrative side of this order. I don't understand why you just don't say, yes, it's binding in the future on the agency, but it doesn't convert it into a nationally applicable regulation. You know, I think you're going to agree with my answer. Well, why don't you try it first, and then I'll tell you whether I agree. Okay. And the answer is that in a subsequent adjudication, the agency could change its interpretation, but the key is it would have to explain the reasons for it, and that explanation would have to pass the standard of judicial review. Exactly. And that's why it is a binding precedent unless legally changed. That's why our precedents work. And agencies also. They're binding until you change them consistent with the rules of the Administrative Procedure Act. So what you've got here is an adjudication that has precedential effect, and I thought when I got in here this morning that your answer was, yeah, that's exactly right, 10th Circuit. It's not nationally applicable because the administrator didn't publish a statement that was, and also because it's a precedent that applies in future adjudications, not a rule. I thought that was your argument. And that's exactly my argument, Your Honor. And if I've been confusing, I'm sorry. But I will point out that the court's case under Dalton, to convert a local action to The finding that the agency makes has to be expressed. The courts will not infer it. That's one path. That's the second path. Counsel has been spoken to principally on the first path. She has the argument, and I thought that's what you were trying to respond to. Not that you haven't made the argument that Judge Tatum has been reviewing, but rather trying to respond to Petitioner's argument that that may all be well and good in many, many, many, many instances. But here, by issuing an order that has a binding interpretation on the agency until the change in position. But it's binding for now. And that disrupts the whole purpose, or a major purpose, of Congress's point in having this Title V process. But sure, it puts all the obligations in one spot, so it makes it easier for the agency to see whether a law is being complied with. But, as I read the brief, the concern is that absent an objection by the administrator to state permits in an enforcement action, well, first, the argument was EPA will never bring an enforcement action. And this order doesn't indicate that in an enforcement action you would not be bound by this position. Your brief says that, but the order doesn't say it. So we have this interpretation now of what is an applicable requirement under Title V. All right? That that's changed, and that's changed the whole procedure here. That's what I hear counsel saying. Your Honor, it has changed what was enunciated in the prior adjudications, but it hasn't fundamentally changed how Title V operates, and it certainly hasn't changed the text of the statute or the reg. Right. Because I believe... I'm just pretending that it did. So what about the internal effect that's on the agency? Ms. Powell said this is not just about whether citizens can urge EPA to look under the hood of the Title I Reconstruction Permit. It's about what EPA does in its own shop on Title V. Is that accurate? Well, the agency would, if confronted with the same facts... For example, there is a 45... In this case, there is a 45-day review period by EPA alone, followed by a 60-day review period of a petition to object. It was a very short timeframe intended for EPA to do a very streamlined function in the context of Title V review. And in the 45 days, EPA did not look back to see if the substance of the state... And that's a more general question. Does this change the way EPA does its job at the Title V level nationally? It depends on the set of circumstances the agency is presented by. And circumstances like this. They were identical circumstances? Circumstances like this in the sense that there's a question about whether a Title I permit is in compliance with the implementation plan and the Clean Air Act more generally. Maybe there was a mistake made. My understanding is that now EPA will say, you know, we look at whether the Title I permit is included in the Title V and done. And that's a change. Yes, in the same circumstances. But let me highlight what the circumstances here are because they weren't adequately represented. The circumstances here are that the state in the pre-construction permit program, in the context of deciding whether or not it's going to be a major or minor, looked at this very issue. It adjudicated. And this is at page 12, I believe, of my brief, where we set out the text of what the state looked at. Now, we have what the state did back in 97. Yes. We understand that. That's not the issue that I understand. Judge Cullard is looking for other scenarios in which the agency may apply the same interpretation. You're looking for other scenarios in which, okay. So in this case, all we can say is that here, where the state did look and adjudicated the threshold question, is this facility's modification, based upon the agency's understanding, the state agency's understanding of the base load, will it exceed the threshold to trigger major or minor? That determination is intrinsically linked. It is one and the same. It's not separate standalone requirements. So the state made the permit decision. It is minor because it's not going to exceed the threshold limit, and therefore a minor permit is appropriate. That adjudication are the facts here. I can't... But EPA says we're not going to look at any of that. The state went through its process. The state issued the permit. End of discussion. It didn't look... Previously, under its previous interpretation, it would have looked at it. So as I understood the thrust of Judge Pillar's question and Petitioner's argument, is the internal operations of EPA in these Title V permitting procedures has changed because your order says, EPA's order says, going forward, this is the way we are going to function. Well, I'm going to answer it two ways. First, the words going forward in that order are positioned after explaining the prior interpretation and then saying going forward in this case, in that adjudication, where it then applied its new interpretation to the background circumstances. Do you think going forward meant only in this case? I think that the agency also intended this would serve some administrative precedent, Your Honor. So I'm agreeing with you that there's also the administrative precedent component of an adjudication, but that is nothing novel. That happens all the time in adjudications, and it doesn't convert an adjudication whose legal scope is only for a particular entity into a nationally applicable rule. Is there any other points you'd like to make? Yes. I just have one quick question. We're about to hear from the intervener, and the intervener argues no Article III standing. You didn't argue that in your brief. Have you changed your mind about that since you've read your brief? Your Honor, the intervener has raised new information about – time hasn't stood still since 1997. The intervener has raised new information. The agency – for all of us. I just asked you a question about standards. So the intervener has raised new information that casts doubt on redressability, and I think it raises a serious issue about redressability in view of that new information. We haven't changed our position. So do you think they have Article – does Sierra Club have standing or not? We don't argue that they've not. That's not the question. We haven't challenged their standing, Your Honor. Okay. You just haven't dealt with it. That's fair. Yeah. We haven't challenged their standing. I'd like to just sum up with one point on the merits, if I might, and that is, Your Honor, that 70.2 has two provisions, two that are relevant here, and the second provision speaks directly to the circumstance of pre-construction permits. It speaks directly to it. And it talks about terms and conditions in permits issued. Those are the words in that text. And that's the red text that EK is interpreting. And it's – that language means that it's not a freestanding requirement in the SIP. It is the application of the permit program and the outcome, the results of that permit program that is an applicable requirement. And this is critical because pre-construction permit programs are required in SIPs, but that doesn't make them self-implementing. They need to be applied by the state decision maker, the state regulatory authority, and it's the outcome of that permit process that identifies what becomes an applicable requirement for that source. And so this second prong of 70.2 speaks specifically to this context. Can you tell me where in your regulatory addendum you're looking? The version I have says that 70.2 is at page 104 of the addendum, but the one I have ends on page 99. Well, my addendum, Your Honor, it's at 134. All right, well, we'll get it. And this is important because now the first prong speaks to requirements, other requirements required by the SIP, but that's the general language. And that language does include the requirement, for example, that there be a permit program, pre-construction permit program. But when you talk about the context here, the second prong is specific, and the agency's interpretation is fully consistent with the text of the reg. I'm sorry, you're looking at 70.2, which is the definition section? Correct. And which definition are you looking at? I'm sorry, applicable requirements. And so it's on page... 70.22, no? Correct. Under the definition of applicable requirements. It's at addendum 60, I guess. I have four different addendums, and yours doesn't appear to have that in it. Okay. We'll clear up this record issue at another time. All right? Maybe you can be certain that what you filed as your addendum includes the entirety of the provision that we're discussing, namely 70.2. My addendum really does include it. Well, apparently... We'll find it. Okay. Thank you, Your Honor. If you have no more questions... Thank you so much. All right, counsel for intervenors. Thank you, Your Honor. May it please the Court, I'm Blaine Rawson, attorney for Intervenor Pacific Court. Before I begin with the two quick points I'd like to make, I would like to respond to two earlier questions by the Court. First, I believe it was Judge Pillard that asked, had there been other instances where EPA had not applied this precedent, we'll call it, that resolves Claim A. It's actually Claim B. It's under the hood. Yes. But it's within the same order. Claim B actually related to a 2008 approval order or permit by the State of Utah. And in that instance, EPA did not rely on its analysis in Claim A. It simply went through the merits and looked and answered that particular question. Counsel referred to Claim C, which I think probably was meaning Claim B. So I refer to that. The second point, I think you also made the same point that the statute, we all wish it would be a lot more clear and say rulemaking belongs to the D.C. Circuit and the field circuits get to handle orders. It doesn't say that. But what it does say is that you look at the final action. And that's what I'd ask this court to do. What is the final action? The final action here is the denial of a petition to object to a Title V permit for a power plant in Castledale, Utah. That's its extent and its power. What CR Club is focusing on is one of the grounds by which EPA made that final action when there were five different claims. So you're looking at one claim out of five and the grounds for disposing of that claim. So certainly our argument would be the final action would relate to the permit on the ground. Now, as far as two additional points, I'd like to make in my short time first. Let me ask you, just in understanding what Congress likely intended, you're an environmental expert, Todd, where if a state agency does make a mistake in Title I approval and if EPA is disinclined to second-guess that, is there any opportunity at any point down the road for anyone to raise the noncompliance of the source with the Clean Air Act? And if so, where? Thank you. Looking at the specific facts of this case, there was a SIP-approved opportunity through the MSR permit process in 1997. Right. And at that time, though, just to be fair, and I know Sarah provisionally assists, but at that time it was their understanding that the agency would allow, would be looking under the hood in a Title V operations permit. So at that time there wasn't that much pressure on them to make sure to get into each and every pre-construction permit proceeding because they thought, well, when these are reconsidered at every five years, if there's a problem, we'll go in then. But by the time your client got around to renewing, which, I mean, there's a lot of talk about delay, but as I understand it, your client didn't apply for the Title V. We timely applied for the renewal. There was a dispute between EPA and the state about what the terms would be of a new Title V permit, which went on for a long time. And it was 19 years? In our case, it was not 19 years. We applied timely within five years. It was issued in 2016, which would have been roughly that. But there were opportunities along the way to answer your question. But if they thought, well, you know, no worries, we can sort of take stock and come in at Title V, is there any, on the facts that we have here, is there any other avenue for any citizen correction if, in fact, a plant is operating out of compliance with the basic clean air act? Using these facts, there was certainly an opportunity in 1998 to do what they did then. But that was through the Title V process. They could have raised an objection. In 2008, when there was a... Why do you say they could have raised an objection? They could have raised this objection? Yes. They're arguing about permit changes in 1997 that occurred before the issuance of the 1998 Title V permit. Right. And that's one of the arguments in our brief. They should have filed within that six years. Because EPA's policy was different then. Yes. They could have raised it in both forms, the state and the federal form. They didn't. In 2008, the state of Utah amended that earlier decision. Now, their argument is that the NSR flaws were so fatal in 1997 that they have permeated permitting since then. So their argument essentially is that the 2008 permit was also wrong for the reasons the 1997 permit was wrong. So they had every ability to raise it in the state process then. And again in 2013. And again in 2014. What we have before this court today... And they're saying again that they would have had to rely on the rule that's now changed to do that in 2008. Those were all state processes. They could have went through the SIP-approved state process all four times. And they didn't. So there were numerous times. Not to mention the opportunity to file a citizen suit alleging that the plant had failed to comply with the NSR requirements. So let me just... A quick question. When the state filed in 2008 the first amendment, it gave notice where? Excuse me. Of the permit? Yes. Of the amendment that it was proposing. So just through the state process. So it goes out through the public comment process. Right. So if I'm in Georgia, how do I know about this proceeding that's going on in Utah? If you're in Georgia and you're concerned about a power plant in Utah, the law requires that public notice be given in the local newspaper. So you simply monitor that. That's right. So you're monitoring all the local newspapers across the country. Yes. I see. Okay. I know my time's up. May I make one final point? Yes, no. Please continue with this. We've interrupted. Which I think is very important. In the Sierra Club's brief, they seem to allude to the fact that the process of challenging a state-issued NSR permit and a Title V petition to object process is both simple and a clarification. And that it's somehow better than this or an alternative to going through the state process of doing it. I'd like to point out from a permittee's perspective the danger of that position, the absolute danger. First of all, as you'll see in the Citizens Against Ruining the Environment case cited in the briefs, there they pointed out that there's only 60 days for the EPA to review the petition to object. There's 45 days initially on their own and then the 60th. That's a very short time to get the petition, to analyze it, to gather information for which there's no provision, and then to make a subsequent decision. These permit actions take months if not years. So that's a very difficult situation, especially where, in this case, you have five different claims spanning 20 years. I can't imagine getting that done in 60 days. But more importantly to us is the petition to object process under 40 CFR 70.8D does not provide for participation by the permittee or the state issuer. So you have a system where a state-issued permit is going to be reviewed without the permittee or the state. You can't in the administrative process. In fact, Pacific Corps submitted a letter. There was no process for it, but as a lawyer I thought I need to advocate zealously for the best interest of my client, so I sent one with our grounds. If you look at the order, you'll see that our letter didn't make it. There's no grounds really to put it in there. Well, we're having enough trouble. Yes, we are. Federal system, not the state system. A couple more points. The permit is never final under the petition to object the way they're interpreting it because of this very problem. According to them, every five years or every permit renewal, you get to bring up an issue that happened 20 years ago. That's no way to run a railroad. I mean, if you're an entity like Pacific Corps is in this case, we've had enormous renovations and new equipment and emission reductions, as was mentioned. But how do you unbreak the age 20 years later? How do you know what to invest if you don't know what to invest? How do you get financing if this becomes the rule? So that's the difficulty. That's why you get a permit that has a time. And that's why you go through the state process, which has timeframes. Yes, I can stand that. You had another point. I did. And that is you're basically allowing the circumvention of the state review process, which this is a perfect illustration of. You're basically making almost a mockery of that SIP-approved process to appeal these NSR permits. If you say, well, you can do that, or we'll give you a different route. That's fair, and it would all be expected. I understand. But in this case, it's what happens. No, but I'm saying the assumption is the state is operating properly. Yes, it is. All right. That's not the assumption of the title. Fair enough. I would just like to close with this statement, though. We're talking about a pre-construction permit 20 years post-construction. There's something wrong with that system, and it can't be the way that Congress intended for that process to work. If there are no further questions, I'll go ahead and sit down. Thank you very much. All right. Counsel for Petitioner. Your Honors, I'd like to quickly start with the issue that Intervenor concluded with, which is the ______. This has been going on here a long time, and we gave you so much time in the beginning. I would ask that you confine your comments to responses you think are necessary. Yes. So as far as this uncertainty that supposedly is created by Title V, Congress gave a specific mechanism for a source to obtain certainty through Title V. And that's actually something they didn't have before. So under Title V, a source can ask that the state determine that the source is not subject to a particular requirement here at major new source review, and then they get a permit shield, and then they're shielded from enforcement. Under the approach that EPA is advocating here, and they've set out in their rule, a source has no idea whether they might be subject to an enforcement action sometime going forward. Right. Right. Okay. So the second is that this action is definitely binding. There have been at least two cases in this court where the court has found that where an interpretation is binding on EPA staff as to how they have to move forward with permitting, then that is a binding action. And that is exactly what is going on here. If you look at Appalachian Power and National Environmental Development Association's Clean Air Project, both cited in our brief, these are situations where, yes, of course, if EPA – But that means binding in terms of the agency's obligation in future cases to either apply it or change it. Right? Isn't that what that means? Yes. But what we're saying here is that this is – EPA has sent out the directive to its regions. Its regional offices normally have the opportunity to object to a Title V permit if it doesn't assure compliance. They can't anymore. And there is one question. EPA contends, well, if it's all very fact-specific and we can look under the hood. No. Their directive is very clear. If the source has a minor source permit, that is the end of the question. There's no other question. So EPA says, oh, well, if circumstances change, perhaps we say something different. No. Because if the source has a minor source permit, then in Title V, the state doesn't have to consider public input. And EPA doesn't have to look at it. So in this case, there was no consideration of the hundred pages of detailed demonstration that Sierra Club put in, saying that this source was subject to major new source review. So no. Sierra Club could have easily shown lots of changed circumstances, but that's not the way that this rule works. This is binding. This will impact the entire Title V program going forward. It operates exactly as a rule. In the terms of the terms and conditions language of the definition of applicable requirements, here EPA has something wrong on the law. They're trying to claim that Part I of the definition says that the requirements of a state implementation plan are applicable requirements, which it does. And then they're saying, well, Part II is just a more specific pullout of this plan requirement. But that's not actually the case. EPA needed to specify that permit conditions were applicable requirements because those conditions are almost never incorporated into a state implementation plan. The EPA wanted to say they were federally enforceable. That's why that's there. It has nothing to do with saying that a permit somehow assures compliance with major new source review. EPA needed to. The Part II, they needed a more specific pullout. Correct. Because. So EPA is now reading that definition. You'll see it runs down and it says, one, requirements of the implementation plan. Two, terms and conditions of permits issued pursuant to Title I, including Part C and D. That's the major new source review requirements. And EPA is saying, well, that is telling us that that's sort of when you're talking about permits and permitting requirements, that's the applicable requirements. And no, it doesn't say that. What EPA was doing is saying, well, these are important requirements. Obviously, the requirements that go into new source review permits need to be in Title V permits. They're some of the most important things the source must do. But in order for something to be approved into a state implementation plan, the state has to submit it formally to EPA. There has to be public notice and comment that it's going into the state implementation plan. And then it's recorded in the CFR as being in the state implementation plan. So in our brief, we point to, well, in Utah, what permits are in the plan? Not very many. Just a handful. And so the point is, this has independent. The second part of that definition is totally independent. It is not some kind of subset of the plan. I think they were saying that the second part is the only part that matters because it is where the implementation plan requirements are brought to bear on a particular plan so that you don't also still need to think about the implementation plan at the Title V process and whether it has requirements that were or weren't properly reflected in the permit, because that's the one that's done and commented on and finalized. There's nothing that says in that definition. That's the one that's done. One, the permits of the state implementation plan have to be in the permit. Two, permit terms and conditions. And so we're saying yes. What are some examples of things that would be in a state implementation plan that wouldn't be sort of in a plan-specific way reflected in the permit? Sure. Are there a bunch of things that are not permit-related? Well, I'm going to say one that is permit-related because that's exactly what we're dealing with here. The state implementation says a source may not construct if it triggers the emission threshold for major new source review. The source may not construct without first obtaining a permit that establishes best available control technology for the source. If a source has constructed or modified and they didn't get the major new source review requirement, then that SIF requirement still needs to be applied. And that's what EPA does when it goes to court and enforces major new source review. Like, of course. Right? They don't go to court and say, oh, well, you know, there's already a minor source permit, so we have nothing to enforce. They're saying, look at this. Maybe this isn't too far afield. But the implementation plan, assume that the permit did, the construction permit did everything it was supposed to do. In that ideal situation, is the state implementation plan also still directly operative on the plant or is it only operative through the A1 perfect well-done permit? The state directly... I'm sorry, are you talking about a new source review permit or are you talking about the Title V permit? A new source review permit. So in a new source review permit, if they've got a major new source review permit, then it doesn't really matter. I mean... Directly applying to them. No, well, I mean, it does, except for they've complied. Through the permit. Well, they've complied by applying for... I mean, the SIP requirement reflects what's in the Clean Air Act. And so we'll say... And then the permit is supposed to reflect what's in SIP. Yes. Okay. So... Anything further? No. I changed my mind. Okay. Anything further? I just wanted to quickly explain that Title V is meant to clean house every five years. There's no absurdity here. The petitioner, in order to get an EPA objection to a permit, has the burden of demonstrating that there is a deficiency. And EPA applies that burden rigorously. And the deficiency you see, given that they say they have gotten cleaner and cleaner and cleaner over the years, what would they have to change that you would want on the merits? Even if they're getting cleaner, they're still not clean enough. Got it. Nobody is saying that's a... Got it. Right? Got it. All right. Thank you. Thank you. We will take the case under advisory.
judges: Rogers, Tatel, Pillard